## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | |
| World Imports, Ltd. | : | BANKRUPTCY NO. 13-15929(SR) |
| | : | |
| Debtor. | : | |
| | : | |
| IN RE: | : | CHAPTER 11 |
| | : | |
| World Imports Chicago, LLC | : | BANKRUPTCY NO. 13-15935(SR) |
| | : | |
| Debtor. | : | |
| | : | |
| IN RE: | : | CHAPTER 11 |
| | : | |
| World Imports South, LLC | : | BANKRUPTCY NO. 13-15933(SR) |
| | : | |
| Debtor. | : | |
| | : | |
| IN RE: | : | CHAPTER 11 |
| | : | |
| 11000 LLC | : | BANKRUPTCY NO. 13-15934(SR) |
| | : | |
| Debtor. | : | |
| | : | |

**DECLARATION OF STEPHEN D. KEANE, CHIEF OPERATING OFFICER AND CHIEF FINANCIAL OFFICER OF THE DEBTORS, IN SUPPORT OF FIRST DAY MOTIONS**

I, STEPHEN D. KEANE, hereby declare under penalty of perjury:

1. I am the Chief Operating Officer and Chief Operating Officer of World Imports Ltd. (WIL), each a debtor and debtor-in-possession in the above captioned chapter 11 cases. In this capacity, I am generally familiar with the Debtors' day to day operations, businesses and financial affairs, and books and records.

2. On July 1, 2013 (the "Petition Date"), each of the Debtors filed a voluntary petition with the United States Bankruptcy Court for the Eastern District of Pennsylvania under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code"). The Debtors are operating their businesses and managing their property as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this declaration (the "Declaration"), the Debtors have sought procedural and joint administration of these chapter 11 cases.

3. To enable the Debtors to minimize the adverse effects of the commencement of this chapter 11 case on their businesses, the Debtor has requested various types of relief in their "first day" motions and applications (each, a "First Day Motion"). The First Day Motions seek relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates.

4. I am familiar with the contents of each First Day Motion (including the exhibits and schedules thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful reorganization of the Debtors; and (c) best serves the Debtors' estates and creditors' interests. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtors' management and the Debtors' advisors. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5. Part I of this Declaration describes the Debtors' businesses, their capital and corporate structures and the circumstances surrounding the commencement of these chapter 11 cases. Part II sets forth the relevant facts in support of each of the First Day Motions.[1]

I.  BACKGROUND

   A.  Commencement of Chapter 11 Cases

6. On the Petition Date, each of the Debtors filed a voluntary petition with the United States Bankruptcy Court for the Eastern District of Pennsylvania under chapter 11 of title 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this declaration (the "Declaration"), the Debtors have sought procedural and joint administration of these chapter 11 cases.

   B.  The History of the Debtors' Business

7. World Imports Ltd. ("WIL") was founded in 1986 by Stan and Sandra Luber. The company initially operated out of a public warehouse, and later purchased and moved into its own facility at 3506 "F" Street in the Kensington section of Philadelphia. As its sales continued

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

to increase, WIL outgrew that location, and eventually moved all Philadelphia operations into the present facility at 11000 Roosevelt Boulevard.

8.  11000 LLC was formed in 1999.  11000 LLC is the owner of the the real property located at 11000 Roosevelt Boulevard, Philadelphia, PA.  11000 LLC leases a portion of its real estate to WIL, a portion to a charter school and a portion to a cellular service provider.

9.  In 2009 the Lubers formed World Imports South, LLC ("South").  South opened a warehouse facility in Walls MS, and has been steadily profitable since its inception.

10.  In 2011 the Lubers formed World Imports Chicago, LLC ("Chicago").  Chicago opened a warehouse facility in Chicago, IL in an effort to become a nationally recognized furniture import company, servicing retail furniture stores of all types.  In the same year WIL also acquired the assets of Hamilton and Spill, a direct container company servicing the US and Canada. The acquisition was done to acquire key customers and use of a mixed container warehouse in Vietnam.

C.  The Debtors' Business

11.  I was retained in April 2013 by WIL as the Chief Operating Officer and the Chief Financial Officer.   All the shares of WIL are owned by the Luber family.

12.  I have been involved in various businesses for thirty (30) years. I worked for General Electric Company (GE) for six (6) rising from a staff auditor to a Manager of Finance. Since leaving GE I have held various financial positions, from Controller to Chief Financial Officer at several companies.  Most recently I was the Chief Financial Officer at Latham Pool Products in Latham, NY

13.  Presently, WIL, South and Chicago operate utilizing 2 distinct methods of selling products to their customers: (a) warehouse business that ships from WIL's, South's and Chicago's warehouse locations, and is either picked up or delivered to a customer's retail store location; and (b) direct container business that is sold and ships directly from the factory to a customers' retail store locations in full container loads.  The direct container business does not require inventory, and is handled through WIL's Philadelphia office. Shipments are monitored from overseas staff/QC/agents and follow up is done between the customer, WIL and the independent sales representative that covers the account.

14.  WIL exhibits new and existing products to its customers out of two national exhibition shows. One in High Point, NC that focuses primarily on the direct container business model and the second is in Tupelo, MS which focuses primarily on the Mississippi distribution center sales.

15.  As of June 30, 2013, WIL's, South's and Chicago's assets consisted of net cash of approximately $300,000; accounts receivable of approximately $9,200,000; total inventories of approximately $8,853,000; prepaid expenses and other current assets of approximately $295,175,

property, plant, & equipment of $1,244,921 and other assets of approximately $1,225,951. 11000 LLC's assets consisted of the real property located at 11000 Roosevelt Boulevard, Philadelphia, PA.

    D.    The Debtors' Corporate Structure

16. WIL is incorporated in Pennsylvania, which is owned by Stanton and Sandra Luber and the Marc C. Luber Sub-Chapter S Trust. South is a Mississippi limited liability company, which is owned by Sandra Luber and Marc Luber. Chicago is an Illinois limited liability company, which is owned by Sandra Luber and Marc Luber. 11000 LLC is a Pennsylvania limited liability company, which is owned by Marc C. Luber.

    E.    The Debtors' Capital Structure

17. As of the Petition Date, WIL, Chicago and South were joint borrowers under a line of credit facility with PNC Bank (the "PNC Loan") As of June 30, 2013, the outstanding balance under the PNC Loan was approximately $11,174,487. As of June 30, 2013, WIL had approximately $3,687,000 of unsecured trade payables. 11000 LLC previously granted PNC Bank a mortgage on its real estate to serve as additional collateral for the PNC Loan. In addition, 11000 LLC is indebted to PIDC for the remaining balance of the acquisition loan for the real estate.

    F.    Events Leading to a Chapter 11 Filing

18. The Debtor's current financial situation is due to a combination of significant events which commenced in early 2011. The first was WIL's acquisition of the assets of Hamilton and Spill company. The inventory held in the rented Vietnam warehouse did not continue to sell profitably, and the expense of the facility outweighed profits. Ultimately WIL shut down the Vietnam operation in 2012 at a significant loss. The Chicago distribution center opened at the end of 2011 has not met sales projections and has operated at a loss.

19. At the end of 2011, the company implemented a new software system to help improve operations, and prepare WIL for growth from increased direct container business, and expansion into Chicago distribution center. The software implementation was not successful and adversely affected WIL's ability to service customers. The software system also caused product over-ordering for more than a years' time, which resulted in WIL having excessive inventory which it was forced us to sell at deeply discounted prices.

20. WIL was also forced to pay an anti-dumping tariff at the end of 2011 of nearly $700,000 which severely impacted the cash flow of the Debtors.

21. In 2012, the WIL wrote off extensive credit losses on customer receivables. In 2012 the Debtors also uncovered an inventory theft ring involving multiple employees.

22.    23.    At the end of 2012 the Debtors implemented a program to dramatically reduce their operating expenses.

24.    The first calendar quarter of each year is historically the best quarter for the furniture industry and WIL, Chicago and South. Unfortunately, due to delayed federal tax refunds, and other economic factors, the industry was extremely sluggish during the first quarter of 2013, and like most furniture companies, the Debtors' sales did not meet projections, causing further financial strain on the Debtors.

25.    The Debtors filed these chapter 11 cases to preserve the value of the Debtors' businesses as a going concern, which is worth in excess of the amounts outstanding under the PNC Loan and all other secured debt.

## FIRST DAY MOTIONS

A.    **Procedural Motions**

**Motion of the Debtors for an Order Directing Joint
Administration of Their Related Chapter 11 Cases**

26.    The Debtors in these chapter 11 cases are affiliated entities. Marc Luber owns substantially more than twenty percent of each of the Debtors. The Debtors request that, in light of the fact that each of the Debtors have filed petitions in this Court, the Court can and should jointly administer their chapter 11 cases. I believe that jointly administering these chapter 11 cases: (a) will ease the administrative burden on the Court and the parties; (b) will protect creditors of different estates; and (c) will simplify the United States Trustee's supervision of the administrative aspects of the Debtors' chapter 11 cases.  Accordingly, I believe that joint administration is in the best interests of the Debtors' estates.

B.    **Operational Motions**

**Motion of Debtors for an Order Pursuant to 11 U.S.C. 363(c) and Fed.R.Bankr.P.
4001, Authorizing Debtors to Use Cash Collateral and Provide Adequate Protection**

27.    The Debtors require the ability to use cash and the proceeds of existing accounts receivable to maintain the operation of their business and preserve its value as a going concern. These essential items, however, constitute part of PNC's Collateral and, therefore, may not be used in support of the Debtors' ongoing business activities absent compliance with Section 363 of the Bankruptcy Code or the consent of PNC.

28.    In accordance with Section 363 of the Bankruptcy Code, the Debtors requests that the Court authorize the Debtors' use of Cash Collateral for an interim period, pending a final hearing on the Debtors' use of Cash Collateral.

29.    The Debtors request authority to use cash collateral in the amount to be set forth

on a budget which will be negotiated with PNC and will be submitted to the Court on or before the hearing date for the cash collateral Motion. The use of cash collateral is necessary in order for the Debtors to be able to operate and pay their post-petition obligations as they come due.

**Motion of Debtors for an Order (A) Authorizing the Debtors to Pay Certain Pre-Petition (I) Wages, Salaries, and Other Compensation, (II) Reimbursable Employee Expenses, And (III) Employee Medical And Similar Benefits; (B) Confirming that the Debtors May Continue Pre-Petition Employee Programs in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor all Related Checks and Electronic Payment Requests**

30.    As of the Petition Date, the Debtors employed approximately one hundred and fifteen (115) employees and no temporary or part-time employees.

31.    The Debtors' employees perform a variety of critical functions including customer service, purchasing, sales, credit, finance, accounting, human resources, bagging, delivery, dispatch, warehouse, marketing, management, and other tasks. The Employees' skills and their knowledge and understanding of the Debtors' operations, customer relations, and infrastructure are essential to the Debtors' businesses.

32.    Just as the Debtors depend on their employees to operate, the employees depend on the Debtors. The vast majority of the Debtors' employees rely exclusively on their compensation and benefits to continue to pay their daily living expenses and these employees will be exposed to significant financial difficulties if the Debtors are not permitted to pay them their full unpaid compensation, benefits, and reimbursable expenses in the ordinary course of business.

33.    To minimize the personal hardship that the Debtors' employees would suffer if pre- petition employee-related obligations are not paid when due or as expected, and to maintain morale and stability in the Debtors' workforce during this critical time, the Debtors, by this Motion, seeks authority to pay and honor, in its sole discretion, certain pre-petition claims for, among other items: wages, salaries, commissions, and other compensation, expense reimbursement, federal and state withholding taxes and other amounts withheld (including, garnishments, employees' share of insurance premiums and taxes), health benefits, insurance benefits, vacation time, sick leave, life insurance, and all other benefits that the Debtor has historically provided in the ordinary course of business (collectively, and as more fully described below, the "Employee Obligations") and to pay all costs incident to the foregoing. In an abundance of caution, the Debtors request the right to modify, change, and discontinue any of its employee compensation, programs, policies and benefits, and to implement new programs, policies and benefits in the ordinary course of business during this Chapter 11 Case in its sole discretion without the need for further Court approval.

34.    In the ordinary course of business, the Debtor incurs payroll obligations to their employees. Such obligations generally comprise wages, salaries and commissions, but may also include expense reimbursement. The Debtors generally pay their employees periodic payments

for wages and salaries every Friday. The Debtor's employees are paid one week in arrears. The Debtors' sales representatives who receive a sales commission are paid such commission once every four (4) weeks on Friday. The next date scheduled for the payment of commissions is July 12, 2013. Sales commissions are normally paid six (6) weeks in arrears.

35.    On average, the Debtor has gross wage and salary expenses of approximately $100,000 every non-commission week, and $140,000 once per month for a commission (gross commission expenses are approximately $40,000 every four weeks).

36.    The Debtor uses ADP to process and pay its payroll. ADP is responsible for paying all the withholdings and payroll taxes (discussed below) to the applicable third parties. ADP impounds the gross payroll (wages, taxes and withholdings) from the Debtor's account on the same day payroll is scheduled to be paid by an ACH charge.

37.    Because all of the Employees are paid in arrears, as of the Petition Date, the Employees may not have been paid all of their pre-petition wages and compensation. Additionally, some Employees may be entitled to compensation because some checks issued to Employees prior to the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date (the "Uncashed Checks").

38.    The Debtor estimates that, as of the Petition Date, approximately $200,000 in pre-petition accrued wages, salaries, and commissions earned prior to the Petition Date remains unpaid (together with the Uncashed Checks and Reimbursable Expenses (as defined below) the "Unpaid Compensation"). As of the Petition Date, the Debtor believes that there may be uncashed payroll and employee reimbursement checks. The Debtor seeks authority, but not direction, to pay the Unpaid Compensation, along with any costs associated therewith.

39.    To the extent any other Unpaid Compensation exceeds the statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code, such payments would be de minimis.    Nonetheless, the Debtors are not seeking authority to pay any of the employees on account of pre-petition accrued wage or benefit obligations in excess of the $11,725 priority cap.

40.    During each applicable pay period, the Debtor routinely deducts certain amounts from employees' paychecks, including, without limitation, (a) garnishments, child support, and similar deductions, and (b) other pre-tax and after-tax deductions payable pursuant to certain of the employee benefit plans discussed herein (such as an employee's share of health care benefits and insurance premiums (collectively, "Deductions"). The Debtor forwards the amount of the Deductions to the appropriate third-party recipients. Due to the commencement of the Chapter 11 Case, however, certain Deductions that were deducted from Employees' earnings may not have been forwarded to the appropriate third-party recipients prior to the Petition Date. Accordingly, the Debtor requests authority, but not direction, to forward any unpaid Deductions to the appropriate third party recipients and to continue to forward these pre-petition Deductions to the applicable third party recipients on a post-petition basis, in the ordinary course of business as

routinely done prior to the Petition Date. The Debtor also requests authority, but not direction, to honor pre-petition checks associated with employee benefits.

41. Further, the Debtor is required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withheld Amounts"). The Debtor must then pay social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "Employer Payroll Taxes"). Prior to the Petition Date, the Debtor withheld the appropriate amounts from Employees' earnings for the Withheld Amounts and the Employer Payroll Taxes (collectively, the "Payroll Taxes"), but such funds may not yet have been forwarded to the appropriate taxing authorities. The Debtor requests authority, but not direction, to forward any outstanding Payroll Taxes to the appropriate third parties, and to continue to honor and process the pre-petition payments for Payroll Taxes on a post-petition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

42. Prior to the Petition Date and in the ordinary course of its operations, the Debtor reimbursed Employees for certain reasonable and customary expenses incurred on behalf of the Debtor in the scope of their employment (the "Reimbursable Expenses"). The Reimbursable Expenses include (a) travel expenses for meals, hotels and rental cars, (b) business development expenses, (c) telephone expenses, and (d) other organization-related expenses that are paid by the Employees. As of the Petition Date, the Debtors have approximately $10,000 in pending requests for expense reimbursement. In addition, it is possible that certain Employees may have incurred pre-petition expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Debtor after the Petition Date. The Debtor estimates that the amount of post-petition requests for reimbursement of pre-petition expenses will not exceed $15,000. Reimbursable Expenses are all incurred on the Debtor's behalf and with the understanding that they will be reimbursed. Accordingly, to avoid harming Employees who may have incurred the Reimbursable Expenses, the Debtors request authority, to be exercised in its sole discretion, to (a) continue paying Reimbursable Expenses in accordance with pre- petition practices, (b) modify its pre-petition policies relating thereto as they deem appropriate, and (c) pay all Reimbursable Expenses that relate to the pre-petition period and are submitted to the Debtor post-petition.

43. The Debtor offers Employees the ability to participate in a number of insurance and benefits programs, including health care, dental plans, vacation time and other paid leaves of absence, retirement savings plans, life insurance, and discretionary plans (collectively, the "Employee Benefit Programs").

44. The Debtor offers third party carrier health insurance to its Employees for medical and dental coverage (collectively, the "Health Insurance"). The Health Insurance coverage costs the Debtor approximately $533,397 per year. Part time employees are only not eligible for Health Insurance.

45. By this Motion, the Debtor seeks authority, in its sole discretion, to (a) continue the Health Insurance for its Employees in the ordinary course of business, (b) continue making contributions to such benefit programs, and (c) pay any amounts related thereto, including on account of any premiums, claim amounts, and administration fees to the extent that they remain unpaid as of the Petition Date.

46. The Debtor provides paid time off (vacation time and sick leave) to its Employees as a paid time-off benefit (the "Vacation Time") and Unused Sick Leave (Sick Leave). The amount of Vacation Time available to a particular Employee and the rate at which such Vacation Time and accrued is generally determined by the Employee's length of employment. When an Employee elects to take Vacation Time, that Employee is paid his or her regular hourly or salaried rate. If an Employee ceases employment with the Debtor, the Employee's final paycheck will include any accrued unused vacation time. Generally, part time employees are not eligible for Vacation Time. Sick Leave is the same for all employees, and the employee may be paid for time not used. The Debtor estimates amount available for employees to claim as of June 28, 2013 is $160,190. The Debtor also allows their Employees to take certain other leaves of absence for personal reasons, many of which are required by law ("Leaves of Absence"). Leaves of Absence include family medical leaves, pregnancy, adoption and foster care leaves, military leaves, jury duty, voting leaves, personal leaves, and bereavement leaves. If an Employee ceases employment with the Debtor, the Employee's final paycheck will include any accrued unused Leaves of Absence. Unused Leaves of Absence are not carried forward to the next calendar year. By this Motion, the Debtor requests that it be authorized, but not directed, to continue to honor its Vacation Time, Sick Leave, and Leaves of Absence policies in the ordinary course of business, and to honor and pay any pre-petition amounts related thereto. Moreover, the Debtor anticipates that its Employees will utilize any accrued Vacation Time, Sick Leave, and Leaves of Absence in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtor's normal payroll obligations.

47. The Debtor maintains a traditional 401(k) and a Roth 401(k) retirement plan meeting the requirements of the Internal Revenue Code for the benefit of Employees (the "Retirement Plans"). The Retirement Plans allow for deductions of eligible compensation up to the limits set by the Internal Revenue Code. The Employee's Retirement Plan contributions are approximately $1,500 every week. The Debtor does not match the Employees' contributions.

**Motion of Debtors for an Order Authorizing and Approving Maintenance and Use of Existing Bank Accounts; Use of Existing Books, Records, and Business Forms; <u>and Continued Use of Existing Investment Guidelines</u>**

48. By this Motion, the Debtors are requesting relief authorizing them to maintain and use their existing bank accounts; existing books, records, and business forms; and investment guidelines.

49. Prior to the Petition Date, the Debtors maintained the following bank accounts (collectively, the "Bank Accounts"):

| DEBTOR | BANK | ACCOUNT NO. | USE OF ACCOUNT |
|---|---|---|---|
| World Imports Ltd | PNC Bank, NA | 8559037775 | Operating Account |
| World Imports Chicago, LLC | PNC Bank, NA | 8616156296 | Depository Account for Chicago |
| World Imports South, LLC | Wells Fargo Bank, NA | 2000045755758 | Depository Account for Mississippi and Miss payroll |
| World Imports Ltd | TD Bank NA | 4280649084 | Operating Acct |
| World Imports Ltd | TD Bank NA | 4785284707 | Savings Account |
| 11000 LLC | PNC Bank NA | 8613186107 | Operating Account |

50. The Office of the United States Trustee's requirements are intended to provide a clear line of demarcation between pre-petition and post-petition transactions and operations and to prevent inadvertent payment of pre-petition claims. However, these requirements could cause substantial delay and disruption to the Debtors in the payment of their post- petition obligations and the conduct of their businesses.

51. In addition, no party in interest will be prejudiced or injured by the Debtors' maintenance of the Bank Accounts in the ordinary course of business. The Debtors strongly believe that if they were required to replace their existing Bank Accounts with new accounts as of the Petition Date, such requirement would unnecessarily disrupt the Debtors' businesses and impair their efforts to preserve the value of their estates.

52. The Debtors also submit that no party in interest will be prejudiced if the Debtors are authorized to continue to use their books, records, and forms substantially in the forms existing immediately prior to the Petition Date.

53. Because parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession, changing business forms is unnecessary and unduly burdensome.

54. The Debtors submit that these efforts are prudent and sufficient to protect the interests of parties dealing with the Debtors on a post-petition basis, while avoiding unnecessary expense and administrative delays at this critical time.

55. Additionally, the Debtors submit that "cause" exists for the court to allow the

Debtors to continue investing and depositing their cash in accordance with their pre-petition cash procedures (the "Investment Guidelines"). The Debtors submit that the Investment Guidelines provide sufficient protection for their cash and that it would he in the best interest of Debtors, their estates and the creditors for Debtors to continue with these Investment Guidelines. The yield on investments under the Investment Guidelines will be greater than if the Debtors were

restricted to direct investments solely in government securities. When considered in the context of the sums of money that are being invested, continued investment under the Investment Guidelines could result in greater returns for the Debtor's estate over time with little additional investment risk.

**Motion for Entry of Interim and Final Orders: Prohibiting Utility Companies from Discontinuing, Altering or Refusing Services; (II) Deeming Utility Companies To Have Adequate Assurance of Payment; and (III) Establishing Procedures for Determining Requests for Additional Assurance Pursuant to 11 U.S.C. § 366**

56.     In connection with the operation of their businesses, the Debtors obtain electric, water, telephone, internet and other similar utility- services provided by a number of utility companies (the "Utility Companies").

57.     Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption of utility services, even for a brief period of time, would disrupt the Debtors' operations. Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, their enterprise value and creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during these chapter 11 cases.

Date:   July 2, 2013                                By: */s/ Stephen D. Keane*
                                                        Stephen D. Keane