# IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE                                       : CHAPTER 11
                                            :
WORLD IMPORTS, LTD.                         :
                                            :
            DEBTOR                          : BANKRUPTCY NO. 13-15929 SR
_____

# OPINION

BY: STEPHEN RASLAVICH, UNITED STATES BANKRUPTCY JUDGE.

*Introduction*

Before the Court are two Motions for Allowance and Payment of Administrative Expense Claim. The first was filed by Fujian Zhangzhou Foreign Trade Co., Ltd. (Fujian) and the second by Haining Wansheng Sofa Co., Ltd. (Haining). Both motions are opposed by the Debtor and the Official Committee of Unsecured Creditors. A hearing on the Motions was held on May 28, 2014, after which the Court took the matter under advisement. For the reasons set forth below, the Motions will be denied.[1]

*Administrative Claim*
*For the Sale of Goods*

The Bankruptcy Code provides that "[a]fter notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including---the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to

---

[1] As this matter involves allowance or disallowance of claims against the estate it is within this court's core jurisdiction. *See* 28 U.S.C. § 157(b)(2)(B).

the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9). The language of the statute provides for the allowance of an administrative claim provided the claimant establishes: (1) the vendor sold "goods" to the debtor; (2) the goods were *received by the debtor* within twenty days prior to filing; and (3) the goods were sold to the debtor in the ordinary course of business. *In re Goody's Family Clothing, Inc.*, 401 B.R. 131, 133 (Bkrtcy.D.Del. 2009) (emphasis added).

This section is thus an exception to the usual treatment of unsecured creditors who supply goods or services prepetition. *In re Pilgrim's Pride Corp.*, 421 B.R. 231, 240 (Bkrtcy.N.D.Tex.2009). It is intended to work in conjunction with § 546(c) for sellers who have valid reclamation claims. *Ningbo Chenglu Paper Products Mrf. Co., Ltd v. Momenta, Inc. (in re Momenta, Inc.),* 11-cv-479*,* 2112 WL 3765171, at *4 (D.N.H. Aug. 29, 2012)*.* Section 503(b)(9) "provides a supplemental remedy for those sellers who would be preferred reclamation sellers, but for a minor disqualification under section 546(a)." *Id.* Not being intended to create a new class of creditors, § 503(b)(9) is to be strictly construed. *See Howard Delivery Serv. Inc. v. Zurich Am. Insur. Co.,* 547 U.S. 651, 655, 126 S.Ct. 2105, 2106 (2006) (noting that § 503(b)(1)-(9) stand as discrete exceptions to the general equality principle and as such must be "clearly authorized by Congress"). A claimant seeking allowance of an administrative claim bears the initial burden of proof. *Goody's,* 401 B.R. at 137 n. 27.

*Record*

The matters have been submitted to the Court on a stipulated evidentiary record and there are no facts in dispute. The operative dates, in particular, are not in dispute and are found in the supporting documents attached to both claims. Each claim is

comprised of more than one order for the purchase of goods. For each such order, there is a set of four documents: Purchase Order, Packing List, Commercial Invoice, and Bill of Lading. As to the Haining claim, the goods were shipped from Shanghai on May 26, 2013 and the Debtor took physical possession of the goods in the United States on June 21, 2013. As to the Fujian claim, the goods were shipped from Xiamen on May 17, May 31 and June 7, 2013. The Fujian claim differs from the Haining claim in one material respect: some of the goods were shipped directly to the Debtor's customers (i.e., drop-shipped) while the remainder went directly to the Debtor. Transcript of Hearing (Tr.) 16.[2] As to the exact date that the Debtor (or its customers in the case of drop-shipments) took physical possession of the subject goods in the United States, the record is unclear. However, the parties appear to agree that this occurred within 20 days prior to bankruptcy.

*Issue*

The sole question before the Court is whether the Debtor "received the goods" within 20 days prior to the bankruptcy filing. The parties disagree on this point because the seller shipped the goods from China much *more than 20 days* before the bankruptcy filing (July 3, 2013), while the Debtor took physical possession of the goods in the United States *fewer than 20 days* before bankruptcy. If, as the Debtor and Committee maintain, "receipt" for purposes of the statute is the date on which the goods were loaded onto a ship in China, then the claim for administrative expense priority must be rejected. If, as the claimants insist, "receipt" is the date that the Debtor took physical

---

[2] As to whether "drop-shipments" were "received" by the debtor, a case on point holds that such shipments were *never* "received" *by the debtor* either during, or prior to, the 20 day period for administrative claims for sales of goods, and that drop-shipments, therefore, cannot qualify for administrative claim status. *Ningbo, supra* , 2012 WL 3765171, at *7

3

possession of the goods in the United States, then the claim will enjoy the highest priority.

*Arguments*

In lieu of briefs, the parties argued their positions in open court. They both agree that this appears to be a case of first impression, as neither could locate a decision on point. The parties disagree on the applicable rule of decision.

Arguing first were the Debtor and the Committee. They maintain that the controlling authority is international commercial law. According to accepted terms of international trade, where a sale occurs FOB in the country of origin, the property is transferred to the buyer once the goods are put on the ship. Tr. 11. Here, that would mean that in each case the Debtor received the goods in question on a date which is more than 20 days prior to bankruptcy. That, in turn, would preclude the claim from administrative expense status.

The claimants counter that because the Bankruptcy Code does not define the word "receive," the Court must look to applicable non-bankruptcy law for an express definition. In this regard, they argue that the Uniform Commercial Code article dealing with sales of goods should apply. They stress that the UCC specifically defines "receipt" as taking physical possession of the goods. They maintain that, since the Debtor did not take physical possession of the goods until they were in U.S. ports, that is when receipt of the goods occurred. Tr. 13. Those dates were within 20 days prior to bankruptcy, and the claims, they argue, would therefore qualify for administrative priority.

*Supremacy Clause and*
*Rules of Decision Act*

      Implicit in the claimants' argument is that state law may provide a rule of decision for gaps in federal statutes. That is indeed the case, so long as the state law does contravene an established federal interest. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87, 114 S.Ct. 2048, 2055 (1994) In that regard, Article VI of the Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. Art. VI cl. 2. *See Malley-Duff & Assoc., Inc. v. Crown Life Insur. Co.*, 792 F.2d 341, 346 (3d Cir. 1986) ("If federal law is both pertinent and valid, it applies because the supremacy clause of the Constitution so commands.") In confluence with the Supremacy Clause, the federal Rules of Decision Act provides that

> the *laws of the several states*, *except where* the Constitution or *treaties of the United States* or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply.

28 U.S.C. § 1652 (emphasis). A rule of decision is defined as a "statute…that provides the basis for deciding or adjudicating a case." *Wazir v. Gates*, 629 F.Supp.2d 63, 65 (D.D.C. 2009). *See Erie RR. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case [in federal court] is the law of the state") (overruling *Swift v. Tyson*, 41 U.S. 1, 10 L. Ed. 865 (1842)); *Highlands Ins. Co. v. Hobbs Group, LLC*, 373 F.3d 347, 351 (3d Cir. 2004).

The Debtor does not dispute that the UCC defines the word "receipt." Rather, the Debtor argues that there exists a treaty which constitutes an exception to the general rule that the UCC would otherwise dictate. A relevant treaty, it goes on to say, incorporates the terms used in international trade that apply to this dispute.

Treaties are a species of federal law. The Constitution vests in the Executive Branch the "[p]ower, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." U.S. Const. Art. II § 2, cl. 2. States are denied the right of treaty-making. *Id.*, Art. I § 10, cl. 1. The general federal question jurisdiction statute grants subject matter jurisdiction over every civil action that arises, inter alia, under a treaty of the United States. 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or *treaties* of the United States.") (emphasis added). Under the constitution, "a treaty is placed on the same footing, and in order of like obligation, with an act of legislation; both are declared by instrument to be the supreme law of the land, and no superior efficacy is given to either over the other." *Whitney v. Robinson*, 124 U.S. 190, 194, 85 S.Ct. 456, 458 (1888); *Flores-Nova v. Att'y General of the U.S.*, 652 F.3d 488, 494 n.6 (3d Cir. 2011)( explaining that a ratified treaty "is the law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined")

*Treaty's Preemptive Force*

"Where Congress has chosen to exercise its authority, contrary provisions of state law must accordingly give way." *In re Roach*, 824 F.2d 1370, 1373 (3d Cir.1987) citing *Johnson v. First National Bank of Montevideo*, 719 F.2d 270, 273 (8th Cir.1983),

6

cert. denied, 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). While "the usual rule is that congressional intent to pre-empt will not be inferred lightly," *Penn Terra Ltd. v. DERC*, 733 F.2d 267, 273 (3d Cir. 1984), where a particular field of law is one of uniquely federal concern, "the conflict with federal policy need not be as sharp as that which must exist for ordinary preemption when Congress legislates in a field which the States have traditionally occupied." *Boyle v. United Technologies Corp.*, 487 U.S. 500, 507, 108 S.Ct. 2510, 2516 (1988) quoting *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152 (1947). If uniformity would serve a federal interest, then the "entire body of state law applicable to the area conflicts and is replaced by federal rules." *Boyle, supra* 487 U.S. at 508, 108 S.Ct. at 2516.

    This is demonstrated best with regard to conflict occurring in the context of foreign affairs. The Supreme Court has explained that a uniform federal law displaces state law as to matters involving international relations. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425, 84 S.Ct. 923, 939 (1964)("We are constrained to make it clear that an issue concerned with a basic choice regarding the competence and function of the Judiciary and the National executive in ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law. S*ee also El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 175, 119 S.Ct. 662, 675 (1999) (declining to apply a home-centered preemption analysis mechanically in construing the country's international obligations)  In sum, state law must yield when it is inconsistent with or impairs the policy or provision of a treaty. *U.S. v. Pink*, 315 U.S. 203, 231, 62 S.Ct. 552, 566 (1942); *see also Nielsen v. Johnson*, 279 U.S. 47, 52, 49 S.Ct. 233, 244 (1929) (explaining that as the treaty-making power is

independent of and superior to the legislative power of the states, the meaning of a treaty provision…is not restricted by any necessity of avoiding possible conflict with state legislation); *Froland v. Yamaha Motor Co., Ltd.*, 296 F.Supp.2d 1004 (D.Minn. 2003) (same)

*CISG*

The treaty upon which the Debtor bases its opposition to the Motions is the Convention on Contracts for the International Sale of Goods (CISG).[3] This treaty applies to "contracts of sale of goods between parties whose places of business are in different States ... [w]hen the States are Contracting States." CISG Art. 1(1)(a). The CISG is a "self-executing treaty with the preemptive force of federal law," which "applies to contracts for the sale of goods between parties whose places of business are in different States ... when the States are contracting States." *It's Intoxicating, Inc. v. Martim Hotelgesellschaft mbH*, No. 11-CV-2379, 2013 WL 3973975, at *16 (M.D.Pa. July 31, 2013). Ratified by the Senate in 1986,[4] the CISG creates a private right of action in federal court. *BP Oil Int'l, Ltd v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 336 (5th Cir. 2003). China is also a signatory to the convention. *See Maxxsonics USA, Inc. v. Fengshun Peiying Electro Acoustic Co., Ltd.*, No. 10 C 1174, 2012 WL 962698, at *4 (N.D.Ill. Mar. 21, 2012) (noting that both the United States and China are CISG signatories). As incorporated federal law, the CISG governs the dispute so long as the parties have not elected to exclude its application. CISG Art. 6. There is no indication in the record that the parties here have opted against its application.

---

[3] 19 I.L.M. 668 (1980), 1980 WL 115526 (I.L.M.)
[4] The treaty was ratified by the Senate on December 11, 19866 and became effective Jan. 1, 1988. *Forestal Guarani v. Daros Int'l Corp.*, 613 F.3d 395, 397 (3d Cir. 2010)

8

Accordingly, the Court finds that the treaty arising out of the CISG applies to this dispute. ; *Asante Technologies, Inc. PMC-Sierra, Inc.*, 164 F.Supp.2d 1142, 1151-1152 (N.D.Cal.2001) (holding that the CISG preempts state law); *see also* Michael P. Van Alstine, *Federal Common Law in an Age of Treaties*, 89 Cornell L. Rev.892, 959 (May, 2004) (observing that the CISG "broadly displaces the state law Uniform Commercial Code in the context of international sales transaction"); William S. Dodge, *Teaching the CISG in Contracts*, 50 J. Legal Educ. 72, 72 (March 2000) ("As a treaty the CISG is federal law, which preempts state common law and the UCC."); David Frisch, *Commercial Common Law, The United Nations Convention on the International Sale of Goods, and the Inertia of Habit*, 74 Tul. L.Rev. 495, 503 (1999) ("Since the CISG has the preemptive force of federal law, it will preempt article 2 when applicable.")

*CISG and Trade Terms*

While the CISG supplies the applicable rule of decision, the Court notes that, like the Bankruptcy Code, the treaty does not define the word "receive." It does, however, contain an express instruction for courts confronted with gaps in the convention's regulatory scheme. Article 7(2) of the treaty provides that

> [q]uestions concerning matters governed by this Convention which are not expressly settled in it are to be settled in conformity with the general principles on which it is based or, in the absence of such principles, in conformity with the law applicable by virtue of the rules of private international law

CISG, art. 7(2). To that end, the CISG goes on to provide:

> The parties are considered, unless otherwise agreed, to have impliedly made applicable to their contract or its formation a usage of which the parties knew or ought to have known and which in international trade is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade concerned.

9

*Id.* Art 9(2). These usages have been memorialized by the International Commerce Commission[5] (ICC), an attendee at the convention. The ICC has defined a number of commercial terms commonly used in international trade. Referred to as "Incoterms,"[6] these "are a set of three-letter trade terms reflecting business to business practice in contracts for the sale of goods. The Incoterm rules describe mainly the tasks, costs and risks involved in the delivery of goods from sellers to buyers." Incoterms®2010, Introduction; *see also Nuovo Pignone, SpA v. Storman Asia M/V,* 310 F.3d 374, 380 n.5 (5th Cir. 2002) (explaining that Incoterms are standard trade definitions used in international sales contracts); *Hanwha Corp. v. Cedar Petrochemicals, Inc.*, 760 F.Supp.2d 426, 428 n.1 (S.D.N.Y. 2011) ("Generally speaking, "Incoterms" is a set of standard trade terms, developed by the International Chamber of Commerce, meant to provide parties to international contracts for the sale of goods with clear definitions of respective rights and liabilities with regard to the shipment of the goods."); *Wing Shing Products, Ltd v. Simatelex Mfr. Co., Ltd*, 479 F.Supp.2d 388, 394 n.3 (S.D.N.Y. 2007) (noting that Incoterms are the most widely recognized non-statutory definitions of trade); *China North Chemical Indus. Corp. v. Beston Chemical Corp.*, 2006 WL 295395, at *1 n.2 (S.D.Tex., Feb. 7, 2006) ("Specifically, Incoterms defines, with respect to each commercial term, what acts the seller must do to effect delivery, what acts the buyer must do to accommodate delivery…") Importantly for present purposes, the ICC's Incoterms are incorporated into the CISG treaty through article 9(2). *See* 332 F.3d at 337.

---

[5] The ICC is a non-governmental organization. It is recognized as the global leader in the development of standards, rules and reference guides for international trade. Incoterms®2010.

[6] Short for *in*ternational *co*mmercial *terms*. It is a registered trademark of the ICC.

*FOB*

Of particular relevance is the inclusion among the eleven Incoterms of the same terms of shipment used by the parties in the instant dispute. The parties agree that the goods were shipped "FOB" from the port of origin. *See Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co., Ltd*, No. 06 Civ. 3972, 2011 WL 4494602, at *4 (S.D.N.Y., Sept. 28, 2011) citing *St. Paul Guardian Ins. Co. v. Neuromed Medical Systems & Support, GmbH,* No. 00–CIV–9344(SHS), 2002 WL 465312, at *3–4 (S.D.N.Y. Mar.26, 2002) (noting that the entire body of Incoterms—*"F.O.B" included*—is incorporated into the CISG through Article 9(2) thereof)(emphasis added). In this case, the Fujian shipment was FOB Xiamen and the Haining shipment was FOB Shanghai. According to the Incoterms®2010,[7] the term Free on Board

> [m]eans that the *seller delivers* the goods on board the vessel nominated by the buyer at the named port of shipment or procures the goods already so delivered. The *risk of loss of or damage to the goods passes* when the goods are on board the vessel, and the buyer bears all costs from that moment onwards.

Incoterms®2010, 87 (emphasis added). The term provides the following with regard to delivery.

> The seller must deliver the goods either by placing them on board the vessel nominated by the buyer at the loading point, if any, indicated by the buyer at the named port of shipment or by procuring the goods so delivered. In either case, the seller must deliver the goods on the agreed date or within the agreed period and in the manner customary at the port.

*Id.*, FOB, ¶ A4. The buyer, in turn, "must take delivery of the goods when they have been delivered as envisaged in A4." *Id.*, ¶ B4

---

[7]Incoterms®2010, ICC Rule for the use of domestic and international trade terms, entry into force: 1 January 2011, International Chamber of Commerce (2010)

11

*Delivery and Receipt*

While the Incoterm definition of FOB does not contain either the word "receive" or "receipt," the definition of FOB that is given aids in interpretation. According to the definition of FOB, once the seller delivers the goods, the risk of loss or damage passes to the buyer. Once delivered, the goods are perforce constructively received by the Debtor. *See Price v. Marathon Oil, Inc.*, 1986 WL 808, at *13 (Ohio App. 1986) *rev'd in part on other grounds*, 32 Ohio St. 3d 397, 513 N.E.2d 776 (1987) (observing that the word deliver ordinarily connotes transfer of possession and is accomplished by any act by which the deliverer irrevocably relinquishes possession and control in such a fashion that receipt of possession by the transferee is assured); *St. Pierre v. North East Ins. Co.*, 471 A.2d 1049, 1052 (Me. 1984) (same). *See also In re Wezbra Dairy, LLC*, 493 B.R. 768, 771 (Bkrtcy.N.D.Ind. 2013) (holding that corn was "received" when delivered to debtor's siloes and not upon sale to debtor's customers); *and see also In re Circuit City Stores, Inc.*, 432 B.R. 225, 229-230 (Bkrtcy.E.D.Va. 2010) (holding that "receipt" of consigned goods occurred when goods were delivered to debtor's warehouses and not when goods were sold to debtor's customers).

Reading the parties' contract documents together with the relevant portions of the CISG Treaty and Incoterms, the Court concludes that, in the case of both of the Motions, receipt of the goods at issue here occurred in China more than 20 days prior to bankruptcy. Consequently, the claimants are not entitled to an administrative priority for those claims.

*Conclusion*

The Debtor did not receive the goods at issue from the claimants within 20 days prior to its bankruptcy filing. As a result, the claims are not entitled to the priority status of an administrative expense under § 503(b)(9).

An appropriate order follows.

By the Court:

_____
Stephen Raslavich
United States Bankruptcy Judge

Dated: June 18, 2014